1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10    THOMAS BLANKS,

11              Plaintiff,              No. 2:11-cv-0171 WBS CKD P

12        vs.

13    MATTHEW CATE, et al.,

14              Defendants.              FINDINGS & RECOMMENDATIONS

15    _____/

16    I.  Introduction

17              Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action

18    seeking relief under 42 U.S.C. § 1983.  In the complaint filed January 19, 2011, plaintiff names

19    as defendants CDCR Secretary Matthew Cate and California Medical Facility Warden Kathleen

20    Dickinson.  (Dkt. No. 1 at 2[1].)  His allegations concern his religious practice of Rastafarianism

21    while incarcerated at the California Medical Facility ("CMF") between 2004 and 2011.

22              Plaintiff alleges that defendants have "fail[e]d to hire or [procure] a Rastafarian

23    Minister" and "fail[ed] to provide a separate outside area as space of worship and set[] up an

24    Administration Office for affairs of the Rastafarian Minister-Staff."  He alleges that, while

25

26        _____
              [1] Page citations are to page numbers assigned by the court's docketing system.

1   CDCR "recognizes Rastafarians as a religion," Rastafarians are not provided accommodations

2   similar to other religious groups at CMF.  Plaintiff alleges that defendants have "fail[ed] to

3   provide Artifact chronos for Rastafarian[s] to possess religious items" and have "refused to

4   provide the allowance of religious headgear (i.e., Tam or Turban) chronos for the wearing of

5   religious ornament in the visiting room similar to Muslim and Jews being permitted to wear

6   [religious headgear[.]"  He also alleges that defendants have "fail[ed] to provide a religious

7   vendor for the Rastafarians as other faiths are granted."  (Id. at 4-5.)

8            Plaintiff claims that defendants substantially burdened his religious exercise under

9   the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA); and violated his

10  First Amendment right to free exercise of religion and his Fourteenth Amendment rights to equal

11  protection and due process.  He seeks damages against each defendant and the following

12  injunctive relief: a Rastafarian minister, an outside worship area and minister administrative

13  office, Rastafarian artifact chronos for religious items, and a vendor memorandum for

14  Rastafarian prisoners.  (Dkt. No. 1. at 3-5.)

15           Pending before the court is defendants' March 9, 2012 motion for summary

16  judgment.  (Dkt. No. 21.)  Plaintiff has filed an opposition (Dkt. No. 29) and defendants have

17  filed a reply (Dkt. No. 31.)[2]  For the following reasons, the undersigned will recommend that

18  defendants' motion for summary judgment be granted.

19  II. Summary Judgment Standards Under Rule 56

20           Summary judgment is appropriate when it is demonstrated that there exists "no

21  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

22  matter of law."  Fed. R. Civ. P. 56(c).

23               Under summary judgment practice, the moving party
                 always bears the initial responsibility of informing the district court
24               of the basis for its motion, and identifying those portions of "the

25  _____

26       [2] On November 2, 2012, plaintiff filed an additional declaration (Dkt. No. 36), which the
    court will consider as evidence submitted in opposition to summary judgment.

1
2

> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

3  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

4  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

5  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

6  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

7  after adequate time for discovery and upon motion, against a party who fails to make a showing

8  sufficient to establish the existence of an element essential to that party's case, and on which that

9  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

10 concerning an essential element of the nonmoving party's case necessarily renders all other facts

11 immaterial."  <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as

12 whatever is before the district court demonstrates that the standard for entry of summary

13 judgment, as set forth in Rule 56(c), is satisfied."  <u>Id.</u> at 323.

14          If the moving party meets its initial responsibility, the burden then shifts to the

15 opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u>

16 <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to

17 establish the existence of this factual dispute, the opposing party may not rely upon the

18 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

19 form of affidavits, and/or admissible discovery material, in support of its contention that the

20 dispute exists.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party

21 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

22 of the suit under the governing law, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

23 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.

24 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

25 return a verdict for the nonmoving party, <u>see</u> <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433,

26 1436 (9th Cir. 1987).

1    In the endeavor to establish the existence of a factual dispute, the opposing party

2 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

3 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

5 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

6 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

7 committee's note on 1963 amendments).

8    In resolving the summary judgment motion, the court examines the pleadings,

9 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

10 any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

11 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

12 court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

13 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

14 produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

15 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

16 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

17 show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

18 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

19 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

20    The court "is not required to comb through the record to find some reason to deny

21 a motion for summary judgment."  Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026,

22 1029 (9th Cir. 2001).  Instead the "party opposing summary judgment must direct the Court's

23 attention to specific triable facts."  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th

24 Cir. 2003).  Statements in a brief, unsupported by the record, cannot be used to create an issue

25 of fact.  Barnes v. Independent Auto Dealers, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

26 /////

On May 18, 2011, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 14.)  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999).  On July 12, 2012, the court issued a second Rand notice to plaintiff pursuant to the Ninth Circuit's decision in Woods v. Carey, No. 09-15548 (9th Cir. July 6, 2012).  (Dkt. No. 26.)  Plaintiff filed his opposition to summary judgment on September 14, 2012.  (Dkt. No. 29.)

III.  Facts

The following facts are undisputed unless otherwise noted:

Plaintiff was transferred to CMF on May 4, 2004.  (DUF 3.)  In January 2005, plaintiff claimed he was a "Bobo Ashanti Rastafari" and asked to wear his hair in dreadlocks covered by a religious headwrap.[3]  (DUF 4.)  Plaintiff was allowed to wear his hair in dreadlocks and to have white or grey religious headwraps.  Plaintiff was not allowed religious headgear that contained colors due to a safety and security-based policy to prevent the display of gang colors, e.g., the color red, associated with the Bloods street gang.  (DUF 8.)

Between 2006 and 2008, plaintiff submitted three inmate appeals requesting various accommodations for his Rastafarian religious practice, two of which were withdrawn.  (Defs.' Ex A, Mirich Decl,  ¶¶ 7-9.)  It does not appear that plaintiff exhausted administrative remedies as to the remaining grievance.  See 42 U.S.C. § 1997e(a).

On December 20, 2009, plaintiff submitted an inmate appeal in Log. No. CMF-09-M-3233.  (Dkt. No. 21-3 at 54-55.)  At that time, non-defendant P. Mirich was the Community Partnership Manager who oversaw religious programs for inmates at CMF.  (Defs.' Ex A, Mirich Decl,  ¶ 2.)  Mirich interviewed plaintiff concerning the December 2009 appeal.  (DUF 11.)  This appeal was partially granted at the Second Level of review on February 11,

---

[3]  Defendants ask the court to take judicial notice of facts about "Rastafarian Beliefs and Practices" as described on the internet website Wikipedia.  The court declines this request as such information is not sufficiently reliable.  See Fed. R. Evid. 201(b)(2).

1  2010.  (Dkt. No. 21-3 at 56-58.)  An appeal of that decision was denied at the Director's Level of

2  review on May 24, 2010.  (Dkt. No. 1 at 28.)

3           While that appeal was pending, plaintiff submitted another appeal dated April 28,

4  2010 in Log. No. CMF-10-1033, renewing his requests for religious headgear and artifact

5  chronos.  (Dkt. No. 21-3 at 83-84.)  By this time, Mirich was no longer Community Partnership

6  Manager; Tim Polasik held that position.  However, Mirich again interviewed plaintiff.  (Defs.

7  Ex. A, Mirich Decl., ¶ 17.)  Polasik also met with plaintiff concerning his requests for religious

8  accommodations.  (DUF 25.)  Plaintiff's April 2010 appeal was partially granted at the First

9  Level of review on June 9, 2010.  (Id. at 85-86.)

10          CMF officials responded to plaintiff's requests as follows:

11  <u>Rastafarian Minister</u>

12          In his December 2009 grievance, plaintiff requested that a Rastafarian minister be

13  appointed at CMF.  If none could be found, plaintiff asked that an inmate be approved to

14  temporarily act as minister until one was provided.  Plaintiff provided the name and address for

15  the Royal Apostles of Haile Selassi in Oakland, California as a contact in locating a Rastafarian

16  representative.  (DUF 10.)

17          In February 2010, the Second Level reviewer stated:

18      A review of other religious groups here at CMF show that they
        either have a designated chaplain, a contract employee or a
19      volunteer from the community to oversee their services.  Mr. W.
        Forbes, a current CMF employee was assisting with the Rastafarian
20      group; however, due to regulations he was informed that he could
        no longer assist during his time off.  Currently the Imam (the
21      Islamic Chaplain) is assigned to tend to the religious/spiritual
        needs of the inmates of the Rastafarian Faith.  [These inmates], per
22      their own request, are currently assigned to meet for worship
        services in Chapel B on Mondays from 13:00 to 14:00 hours.  Due
23      to Monday's being the Imam's day off, when the new Catholic
        Chaplain is hired, he will be assigned as the person to tend to the
24      Rastafarian needs.  Mr. Forbes and I are currently canvassing the
        local community for a leader of the Rastafarian Faith who would
25      be willing to volunteer to lead the worship services.  If you are
        requesting an inmate be permitted to assume the role of minister of
26      the group until a volunteer is located, I refer you to [Department

6

regulations]. . . . Any inmate who feels he is qualified to perform
this task may author a memorandum to the Warden stating their
request to be considered a temporary minister and list their
qualifications.

(Dkt. No. 21-3 at 56-57.)

The Second Level reviewer further determined that "there are currently not

enough inmates of the Rastafarian Faith here at CMF to warrant hiring a staff minister, however

CMF is actively seeking a volunteer from the outside community to hold the services you are

requesting." (Id. at 57.) Similarly, on Director's Level review, the reviewer stated that "a full

time Rastafarian minister will not be considered due to the small group that practices the faith;

however, the community partnership manager is actively seeking a volunteer from the

community." (Dkt. No. 1 at 28.) From lists submitted by plaintiff, it appears that from July 2006

to August 2011, between 14 and 18 inmates at CMF identified as Rastafarian. By late November

2011, 21 inmates identified as Rastafarian. (Dkt. No. 29 at 30-32.)

Plaintiff did not subsequently make a request showing that he was qualified to

lead Rastafarian services.[4] (DUF 11.)

In his declaration, Polasik states that plaintiff asked him to schedule Rastafarian

group services on Saturdays. Polasik states that, during this time, there was a shortage of

chaplains available to facilitate inmate religious programs, and the prison was in the process of

filling a vacant position. As a temporary solution, plaintiff and other Rastafarians were allowed

to meet outside in a fenced area between the outside areas used by nature-based religious groups,

---

[4] Plaintiff notes that in a July 2006 grievance, No. CMF-06-M-1473, he "clearly
outline[d] his request to be the representative of the Rastafarian collective." (Dkt. No. 29 at 6;
see Dkt. No. 21-3 at 37-39.) In an August 2006 decision, the Second Level reviewer stated that
plaintiff's request "is denied at this time due to the safety and security of the institution, meaning
there must be a staff representative present during these services." (Dkt. No. 21-3 at 41.) As a
general rule, inmate ministers are not approved because of the potential for conflict and undue
influence over other inmates. (DUF 30.) In plaintiff's case, there had been some conflict
between plaintiff and other Rastafarian inmates over the question of whether the religion allowed
homosexuality. Plaintiff also had a number of disciplinary actions in his record. (Id.)

like the Wiccan and Odinists, and the Native American spiritual grounds.  That area was under direct observation and supervision by officers.  When the vacant chaplain position was filled, the Rastafarian service was again scheduled in the chapel.  (DUF 29.)

In opposition to summary judgment, plaintiff asserts that Rastafarian inmates at CMF were "denied services" for almost a year "because CDCR never hired a Catholic priest." (Dkt. No. 29 at 5.)  In sum, it appears that for a period of several months at CMF, due to scheduling and staffing issues, Rastafarian inmates were allowed to meet outside in a fenced area near where other religious groups met, but were not led by a chaplain or an inmate minister.

As of December 2, 2011, Rastafarian group services at CMF were scheduled for Tuesday afternoons in Chapel B, led by the Islamic chaplain.  (Dkt. No. 21-3 at 89.)

Place of Worship

In his December 2009 grievance, plaintiff asked that an outside area be made available for Rastafarian worship.[5]  Plaintiff claimed that an outside area was needed because Rastafarians were not allowed to burn incense, engage in drumming and chanting, or play music recordings in the chapel.

Plaintiff was apparently mistaken about certain activities being banned in the chapel.  In February 2010, the Second Level reviewer stated that there was "no security issue if a Rastafarian drum service is held inside of Chapel B during a scheduled worship service."  In a later meeting, Polasik also told plaintiff that religious drumming or chanting or the playing of music was allowed in the prison's chapels.  (DUF 28.)

/////

---

[5]  The fenced area where Rastafarian services were held in 2010 was not the outside area plaintiff requested.  Plaintiff specifically "asked that a courtyard area outside Chapels A and B be opened" for Rastafarian religious use.  (DUF 10.)  However, for safety and security reasons, inmates were not allowed to access the courtyard area outside the chapels.  The courtyard is located near the unit at CMF where administrative segregation inmates are housed, and access to the courtyard is restricted to prevent communication between the administrative segregation inmates and other inmates.  In the past, an inmate attempted to escape by climbing from the courtyard onto the roof of an adjoining building.  (DUF 22.)

1        However, the Second Level reviewer stated, "[t]he authorizing of the use of

2  incense for your religious service must first go through the Religious Review Committee for

3  initial approval.  Please document this request . . . and send it to the office of the Community

4  Partnership Manager for processing." (Dkt. No. 21-3 at 57.)  The burning of incense also had to

5  be approved by the prison's Fire Chief, as open flame devices could be allowed for ceremonial

6  purposes if they did not pose a fire hazard.  (DUF 17-21.)  Plaintiff did not document a religious

7  need to burn incense for Rastafarian group services and did not submit a request for approval.

8  (DUF 15.)

9        On Director's Level review, it was noted that plaintiff's request "for a secondary

10  place of worship was denied."  (Dkt. No. 1 at 28.)

11        As described above, Rastafarian inmates were assigned to a fenced outdoor area

12  for worship services at CMF until a chaplain and/or chapel space was available.  Plaintiff

13  subsequently requested that Rastafarian inmates be allowed to resume services in the chapel.  On

14  First Level review of plaintiff's April 2010 grievance, the reviewer states: "Lieutenant Mirich has

15  . . . informed me that you are requesting time in Chapel B on Sunday to hold a worship service.

16  This information has been passed on to Mr. Polasik who will review the current chapel schedule

17  and get with you to find a better time for your services." (Dkt. No. 21-3 at 85.)  As noted above,

18  by December 2011, the Rastafarians were scheduled for weekly services facilitated by an Islamic

19  chaplain in Chapel B.

20  <u>Religious Artifact Chronos</u>

21        In his December 2009 grievance, plaintiff asked that prison officials provide

22  religious chronos allowing him to have a portrait of Emperor Haile Selassie; a Lion of Judah

23  Banner; religious headgear and permission to wear it in the visiting room; a religious necklace or

24  bracelet with the colors red, green, and gold; oils and incense; and recordings of drumming and

25  chanting.  His exhibits to the grievance included a November 2005 religious chrono showing that

26  he was allowed to have dreadlocks and an October 2006 chrono showing that he was allowed to

1    carry a Lion of Judah banner to and from Rastafarian services.  (Dkt. No. 21-3 at 72-73.)

2              In response, the Second Level reviewer stated:

3         [N]ew chronos for 2010 are currently being retyped and will be
          distributed to inmates of the Rastafarian Faith as soon as they are
4         completed and signed.  These chronos will include all items
          currently authorized for wear/possession by inmates of the
5         Rastafarian Faith.  These items will also be included in the updated
          CMF D.O.M. Supplement of Section 101060.

6

7    (Dkt. No. 21-3 at 57.)  The Director's Level decision in May 2010 similarly stated: "[N]ew

8    chronos are being prepared that will list those items approved for Rastafarian worship."  (Dkt.

9    No. 1 at 28.)

10             In his April 2010 grievance, plaintiff complained that, although he had been told a

11   meeting would take place to resolve his request for artifact chronos, no such meeting had

12   occurred and he still had not received approval for these items.

13             In his June 2010 response, the First Level Reviewer stated:

14        These chronos are in the possession of the Community Resources
          Manager, [Polasik].  Mr. Polasik has reviewed the chronos and is
15        forwarding them to Administration for review/approval of the
          items and then to the Warden for final approval and her signature.
16        Once these chronos are signed, you will be given a copy which
          allow all documented members of the Rastafarian faith group to
17        possess the approved items listed on the chrono.

18   (Dkt. No. 21-3 at 85.)

19             In a declaration, Polasik states plaintiff did not receive new religious chronos

20   before he left CMF in December 2011.  Polasik states that he advised not to approve religious

21   accommodations through the issuance of new chronos because a Wardens' Advisory Group was

22   reviewing all new religious accommodation requests in an effort to ensure that requests from

23   inmates at different institutions were treated consistently.  Defendants assert that plaintiff

24   continued to be allowed to practice Rastafarianism and have previously approved items and

25   accommodations, even though the new religious chronos were not issued.  (DUF 31.)

26   /////

1    From the record, it is not clear exactly what items plaintiff was allowed to possess

2    while awaiting the issuance of new religious chronos in 2010.  Plaintiff's evidence includes an

3    August 2006 chrono stating he was approved "to possess and carry the Rastafarian religious

4    artifact 'Lion of Judah' banner, to and from religious services," which expired in August 2007.

5    (Dkt. No. 29-1 at 6).  A December 2011 property inventory states that plaintiff possessed grey

6    and white Rasta hats. (Dkt. No. 29 at 47).  In sworn declarations, three CMF Rastafarian inmates

7    state that they witnessed plaintiff receive a "picture of Haile Selassie at the Rastafarian service

8    that was given to him by the Community Project Manager Tim Polasik."  They also state that

9    plaintiff possessed "a Rastafarian religious banner and two head-gear turbans[,]" but do not

10   specify when these events occurred.   (Id. at 48-53.)  In his declaration, Mirich asserts that

11   plaintiff would have been allowed to bring an approved religious banner to group services and

12   would have been allowed to have a portrait of Emperor Haile Selassi.  Plaintiff would also have

13   been allowed to have a religious medallion and chain with an approved symbol, but not colored

14   medallions, for the same safety and security reasons that applied to religious headgear.  (DUF

15   13.)

16   At his meeting with Polisak, plaintiff requested chronos allowing him to keep

17   certain religious items in his cell for personal use, but also bring them to Rastafarian meetings.

18   As a general rule, an inmate is allowed a religious picture, religious books like a Bible, and an

19   approved religious medallion for personal use.  Other, larger items would be allowed for group

20   religious use but otherwise kept by prison staff.  (DUF 26.)

21   Plaintiff said he had an outside person willing to donate the items he wanted.

22   Polasik told plaintiff to have the donor send Polasik the items to review to determine if they

23   would be allowed.  Contrary to Polasik's instructions, the donated items were sent directly to

24   plaintiff, and staff returned them to the sender as unauthorized.  Polasik told plaintiff he could

25   contact the donor and have the items resent to Polasik as instructed.  The donor did not resend

26   the items.  (Id.)

Religious Vendor

In his December 2009 grievance, plaintiff asked that a Rastafarian vendor be approved so that inmates could purchase approved Rastafarian religious artifacts.

In February 2010, the Second Level reviewer stated: "Please have the inmates of the Rastafarian faith submit a list of requested vendors and these vendors will be reviewed by the Community Partnerships Manager.  A vendor or vendors for approved Rastafarian items will be established."  (Dkt. No. 21-3 at 57.)

In May 2010, the Director's Level reviewer noted: "[A] vendor has been approved and the institution is awaiting the names and addresses of those who can provide the approved Rastafarian items and artifacts."  (Dkt. No. 1 at 28.)

In a June 2010 response to plaintiff's April 2010 grievance, the First Level Reviewer stated: "You have given Lieutenant Mirich the name and address of a vendor who can fill your religious artifact requirements.  This information will be passed on to Mr. Polasik who will complete the required documents to grant this part of your request."  (Dkt. No. 21-3 at 85.) The reviewer further noted that a meeting was scheduled on June 15, 2010 "in order to finalize any outstanding issues in regards to the Rastafarian faith" and that plaintiff's religious requests were "being processed for approval as long as they meet all required policies and procedures." (Id. at 85-86.)

Plaintiff was transferred from CMF to Deuel Vocational Institution-Main (DVI) on December 22, 2011.  (DUF 1.)  One month later, plaintiff submitted an inmate appeal requesting the same religious accommodations that he seeks in the instant complaint, filed on January 19, 2011.  (Dkt. No. 29 at 21.)  A May 13, 2012 chrono from DVI states that plaintiff is authorized to possess numerous Rastafarian items.  These include a religious medallion and chain; religious literature purchased from an approved vendor; photos of "religous symbols or personalities"; white, black, or gray turbans or tams; 4 oz. of ceremonial fragrance; 3 compact discs of Rasta worship music quarterly; and a photo of a banner.  The chrono states that

1   "[r]eligious head coverings, medallions or public approved artifacts may be worn in the Housing

2   Units, Corridors, Yards, Dining Halls, Visiting Rooms religious meeting rooms, Board/Review

3   hearings and work assignments at the discretion of the supervisor relative to safety concerns."

4   (Id. at 23.)

5           DVI also issued a May 9, 2012 memorandum in response to plaintiff's "inquiries

6   regarding the purchase of religious artifacts, and approval for Rastafarian services for groups of

7   inmates[.]"  The memo describes CDCR procedures for "the purchase of religious artifacts"

8   through inmates' trust accounts or by a third party.  The memo stated that, as of May 2012, there

9   was "no prior history" of Rastafarian services at DVI.  It outlined the process for establishing a

10  new religious practice at DVI, including an inmate needs assessment, a resource assessment, and

11  other steps.  The memo indicated that, as of May 2012, DVI staff were "near the end of the

12  Needs Assessment phase (due to the Lock-Down) and at the beginning of the resource

13  assessment, appropriations stage of establishing Rastafarian services at DVI."  (Id. at 24.)

14  IV.  RLUIPA

15          Plaintiff claims that defendants substantially burdened his religious exercise of

16  Rastafarianism at CMF.  The RLUIPA provides:

17              No government shall impose a substantial burden on the religious
                exercise of a person residing in or confined to an institution ... even
18              if the burden results from a rule of general applicability, unless the
                government demonstrates that imposition of the burden on that
19              person (1) is in furtherance of a compelling government interest;
                and (2) is the least restrictive means of furthering that compelling
20              government interest.

21  42 U.S.C. § 2000 cc-1(a). "RLUIPA defines 'religious exercise' to include 'any exercise of

22  religion, whether or not compelled by, or central to, a system of religious belief.'"  Greene v.

23  Solano County Jail, 513 F.3d 982, 986 (9th Cir. 2008) (quoting 42 U.S.C. § 2000cc-5(7)(A)).

24  RLUIPA "mandates a stricter standard of review for prison regulations that burden the free

25  exercise of religion than the reasonableness standard under Turner."  Shakur v. Schriro, 514 F.3d

26  878, 888 (9th Cir. 2008) (citing Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005)).

1    Plaintiff bears the initial burden of demonstrating that defendants substantially burdened the

2    exercise of his religious beliefs.  Warsoldier, 418 F.3d at 994-95.  "A 'substantial burden' on

3    'religious exercise' must impose a significantly great restriction or onus upon such exercise."  Id.

4    at 995 (citing San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.

5    2004).

6              Before turning to the parties' evidence, the court considers what type of relief is

7    available to plaintiff against defendants Cate and Dickinson under RLUIPA.

8              Plaintiff seeks compensatory damages against defendants, but does not indicate

9    whether he is suing them in their official or individual capacities.  If the former, official-capacity

10   damages under RLUIPA are barred by the state's Eleventh Amendment sovereign immunity.

11   Sossamon v. Texas, 131 S. Ct. 1651, 1663 (2011); Holley v. California Dept. of Corrections, 599

12   F. 3d 1108, 1114 (9th Cir. 2010) ("The Eleventh Amendment bars Holley's suit for official-

13   capacity damages under RLUIPA.")

14             As to whether individual damages are available under RLUIPA, the United States

15   Supreme Court has not resolved this question and Ninth Circuit Court of Appeals has expressly

16   reserved the issue.  See Florer v. Congregation Pidyon Shevuyim, N.A., 639 F.3d 916, 922 n. 3

17   (9th Cir. 2011) ("Defendants do not challenge, and we do not decide, RLUIPA's application to

18   private actors sued for damages in their individual capacity .... The Ninth Circuit has not ruled on

19   this issue in a precedential opinion, and we reserve this question for another day.").

20             However, five circuit courts have held that RLUIPA does not authorize suits for

21   damages against government officials in their individual capacities.  See Stewart v. Beach, ----

22   F.3d ----, 2012 WL 6582331, at *8 (10th Cir. Dec. 18, 2012); Rendelman v. Rouse, 569 F.3d 182,

23   187-89 (4th Cir. 2009); Sossamon v. Texas, 560 F.3d 316, 327-29 (5th Cir. 2009); Nelson v.

24   Miller, 570 F.3d 868, 886-89 (7th Cir. 2009); Smith v. Allen, 502 F.3d 1255, 1271-75 (11th Cir.

25   2007).  Most courts have assessed Congress's power to enact RLUIPA as stemming from its

26   Article I spending power.  See generally Nelson, 570 F.3d at 886.  These courts have reasoned

1   that, because individual officers are not the recipients of federal funds, Congressional enactments

2   pursuant to the Spending Clause do not impose liability on individual defendants.  Several district

3   courts in the Ninth Circuit have also concluded that RLUIPA does not authorize suits for damages

4   against government officials in their individual capacities.  Kindred v. California Department of

5   Mental Health, No. 1:08-cv-1321-AWI-GSA-PC, 2011 WL 2709104, at *8-9 (E.D. Cal. July 12,

6   2011) (and cases cited therein); Birdwell v. Cates, No. Civ. S-10-0719 KJM GGH P, 2012 WL

7   1641964, at *9 (E.D. Cal. May 9, 2012) (and cases cited therein).  See also Washington v. Brown,

8   No. 2:06-cv-1994 WBS DAD (PC), 2012 WL 3704847, at *2-7 (E.D. Cal. Aug. 24, 2012),

9   (adopted insofar as consistent with district court order issued October 5, 2012).  The undersigned

10  finds no reason to depart from the Fourth, Fifth, Seventh, Tenth and Eleventh Circuits and various

11  Ninth Circuit district courts in concluding that RLUIPA does not create a damages remedy against

12  individual defendants.  Thus defendants are entitled to summary judgment on plaintiff's damages

13  claims under RLUIPA.

14           As to plaintiff's requested injunctive and declaratory relief, the complaint seeks

15  such relief based on prison policies and conduct of officials at CMF.  Plaintiff was transferred to

16  DVI on December 22, 2011.  Generally, when an inmate seeks injunctive or declaratory relief

17  concerning the prison where he is incarcerated, his claims for such relief become moot when he is

18  no longer subjected to those conditions. Nelson v. Heiss, 271 F.3d 891, 897 (9th Cir. 2001);

19  Dilley v. Gunn, 64 F.3d 1365, 1368 (9th Cir.1995); Johnson v. Moore, 948 F.2d 517, 519 (9th

20  Cir.1991).  Thus plaintiff's claims for injunctive relief against defendant Warden Dickinson

21  should be denied as moot.

22           In his opposition to summary judgment, plaintiff argues that prison officials at DVI

23  perpetuated the challenged policies at CMF.  (Dkt. No. 29 at 9-10.)  Plaintiff's claims for

24  injunctive and declaratory relief against Secretary Cate (or rather, his successor under Federal

25  Rule of Civil Procedure 25(d)) are not mooted by his transfer to another prison insofar as

26  \\\\\

1    plaintiff's claims concern CDCR practices, policies, or procedures.[6]  See Nelson, 271 F.3d at 897.

2    Thus the remaining issue is whether defendant Cate is entitled to summary judgment on plaintiff's

3    RLUIPA claims for injunctive and declaratory relief.

4               The court first considers whether plaintiff has shown that his exercise of religious

5    belief was substantially burdened by CDCR policies, practices, or procedures.  Here, the answer is

6    no.  Prison officials at CMF declined to hire a Rastafarian chaplain, citing the relatively small

7    number of Rastafarian inmates.[7]  However, chaplains of other faiths were assigned to facilitate

8    Rastafarian services, which were held either in the chapel or, for some months, in a secure outside

9    area where other religious groups met.  Even though Rastafarians at CMF lacked any chaplain for

10   several months, this was due to scheduling and staffing constraints specific to CMF.  Plaintiff or

11   another Rastafarian inmate could have applied to lead the group until a chaplain was appointed,

12   but did not.  In any case, with respect to chaplaincy issues specific to CMF, defendant Cate would

13   not be the proper defendant for injunctive relief.

14              Plaintiff's request for a "separate outside area as space of worship" at CMF has

15   also been mooted by his transfer to DVI and is institution-specific.  Plaintiff points to no CDCR

16   policy, practice, or procedure that precludes him from drumming, chanting, or burning incense as

17

18        [6]  For claims seeking injunctive relief in which a state practice, policy, or procedure is
19   attacked on federal grounds, it is not necessary to allege the personal involvement of a state
     official if the practice, policy, or procedure relates in some way to the job duties of the named
20   defendant. Ryles v. Felker, 2008 WL 1901231, at *3 (E.D. Cal. Apr.28, 2008). "All that is
     required is that the complaint name an official who could appropriately respond to a court order
21   on injunctive relief should one ever be issued." Id.  See also Rouser v. White, 707 F. Supp. 2d
     1055, 1066 (E.D. Cal. 2010) (proper defendant for injunctive relief regarding implementation of
22   a CDCR policy would be the Secretary of the CDCR in his official capacity or, to the extent that
     the policy is institution-specific, the warden in his official capacity).

23        [7]  In McCollum v. CDCR, 647 F.3d 870, 874-75 (9th Cir. 2011), the Ninth Circuit set
24   forth a detailed description of CDCR's historical and current policies with respect to its
     chaplaincy program, including the criteria CDCR uses "in determining the need for a given paid
25   chaplaincy position."  Defendants cite to the facts recited in McCollum.  (Dkt. No. 21-1- at 11.)
     However, courts may take judicial notice of another court's opinion for the existence of the
26   opinion, but not for the truth of the facts recited therein.  Lee v. City of Los Angeles, 250 F.3d
     668, 690 (9th Cir. 2001).

1  part of his religious practice, the latter subject to appropriate review for fire safety.  Plaintiff also

2  requests an administrative office for a Rastafarian minister, but the lack of this facility cannot be

3  construed as a "substantial burden" on plaintiff's religious exercise.

4          As to plaintiff's request for chronos allowing him to possess various Rastafarian

5  items, his requests to CMF officials have been mooted, and the evidence shows he is allowed to

6  possess numerous religious artifacts and headgear at DVI.  He has not shown that any CDCR

7  policy, practice, or procedure is burdening his religious exercise in this regard.

8          Similarly, while plaintiff suffered some delay in the approval of a Rastafarian

9  religious vendor at CMF, this request has been mooted by his transfer to DVI.  A May 2012

10  memorandum submitted by plaintiff outlines CDCR procedures for inmates' purchase of religious

11  articles through outside vendors.  Insofar as plaintiff is seeking DVI's approval of a specific

12  vendor of Rastafarian items, that is a DVI-specific issue and does not implicate defendant Cate.

13          At DVI, non-defendant prison officials appear responsive to plaintiff's request to

14  establish a Rastafarian religious program through institutional procedures.  Because plaintiff has

15  not shown that any CDCR policy, practice, or procedure has substantially burdened his access to

16  religious services, no injunctive relief against defendant Cate is warranted on this basis.  Thus

17  both defendants should be granted summary judgment on the RLUIPA claims.

18  V.  § 1983

19          The Civil Rights Act provides as follows:

20          Every person who, under color of [state law] ... subjects, or causes
            to be subjected, any citizen of the United States ... to the deprivation
21          of any rights, privileges, or immunities secured by the Constitution
            ... shall be liable to the party injured in an action at law, suit in
22          equity, or other proper proceeding for redress.

23  42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the

24  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

25  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

26  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

1   meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits

2   to perform an act which he is legally required to do that causes the deprivation of which complaint

3   is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

4          Here defendants are immune to section 1983 damages claims against them in their

5   official capacities under the Eleventh Amendment.  Such claims are really suits against the

6   governmental employer because the employer must pay any damages awarded.  Butler v. Elle, 281

7   F.3d 1014, 1023 n.8 (9th Cir. 2002).  The Eleventh Amendment prohibits federal jurisdiction over

8   claims against a state unless the state has consented to suit or Congress has abrogated its

9   immunity.  Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99–100 (1984).  The

10  state's consent to suit must be unequivocally expressed.  Id.

11         Insofar as defendants are sued in their individual capacities, liability under section

12  1983 arises only upon a showing of personal participation by the defendant.  Taylor v. List, 880

13  F.2d 1040, 1045 (9th Cir. 1989), citing Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979).

14  There is no respondeat superior liability under section 1983.  Id, citing Ybarra v. Reno

15  Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984).  However, on a theory

16  of "direct liability" under section 1983, a supervisory official is liable "even without overt

17  personal participation in the offensive act if supervisory officials implement a policy so deficient

18  that the policy itself is a repudiation of constitutional rights and is the moving force of the

19  constitutional violation."  Redman v. County of San Diego, 942 F.2d 1435, 1447 (9th Cir. 1991).

20         A claim for injunctive relief, as opposed to monetary relief, may be made on a

21  theory of respondeat superior in a section 1983 action.  See Peavy v. Rohlfing, 2012 WL 4364502,

22  at *3 (E.D. Cal. Sept. 20, 2012) (citing cases).  For the reasons discussed above, any claims for

23  injunctive relief against defendant Dickinson are mooted by plaintiff's transfer to DVI.  In fact, by

24  the time plaintiff left CMF in December 2011, nearly a year after filing the complaint, CMF

25  officials had addressed some of the issues plaintiff raises.

26  \\\\\

1    A.  First Amendment

2              In order for a prisoner to prove that his First Amendment right to free exercise of

3    his religion has been violated, he must show that his practice of his religion was burdened by the

4    prevention of his engaging in conduct mandated by his faith without any justification reasonably

5    related to interests concerning the care of committed persons.  See Freeman v. Arpaio, 125 F.3d

6    732, 736 (1997) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).  Several factors are relevant in

7    determining the reasonableness of the acts of prison officials.  First, there must be a valid and

8    rational connection between the jail official's actions and the interest put forward to justify those

9    actions.  Turner, 482 U.S. at 89.  Second, the court must consider whether there are alternate

10   means of exercising the right impinged upon.  Id. at 90.  Third, the court must consider the impact

11   that accommodation of the asserted First Amendment right will have on guards, other inmates,

12   and prison resources.  Id.  Finally, the absence of alternatives is evidence of the reasonableness of

13   the restriction of the asserted First Amendment right.  Id.

14             As to plaintiff's request for a Rastafarian chaplain, the Constitution does not

15   require prisons "to provide each inmate with the spiritual counselor of his choice."  Allen v.

16   Toombs, 827 F.2d 563, 569 (9th Cir.1987).  Prisons need only provide inmates with a "reasonable

17   opportunity" to worship in accord with their conscience.  Id.  The Constitution does not require

18   "that every religious sect or group within a prison - however few in number - must have identical

19   facilities or personnel. A special chapel or place of worship need not be provided for every faith

20   regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent

21   of the demand.  But reasonable opportunities must be afforded to all prisoners to exercise the

22   religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."

23   Cruz v. Beto, 405 U.S. 318, 322 n.2 (1972).

24             Here, plaintiff has not shown that prison officials' failure to provide a Rastafarian

25   chaplain denied him a reasonable opportunity to exercise his faith.  Evidence submitted by

26   plaintiff indicates that less than 20 inmates at CMF identified as Rastafarian for most of the

1   relevant period.  The Rastafarians were assigned a Muslim chaplain to assist with their services

2   and a time slot for chapel worship.  However, for several months, when an unfilled position made

3   a chaplain unavailable to oversee Rastafarian services in the chapel, the Rastafarians met in an

4   outside area without a chaplain's assistance, near where other religious groups met.  Although

5   plaintiff was advised that he could request that he or another inmate be approved as a temporary

6   inmate minister, he never submitted such a request.  By December 2011, Rastafarians were again

7   scheduled for a weekly chapel slot, overseen by a paid Muslim chaplain.  During this period,

8   prison officials repeatedly acknowledged that Rastafarian inmates were entitled to religious

9   accommodations such as weekly gatherings, artifact chronos, special headgear, and permission to

10  drum, chant, and possibly burn incense in their ceremonies.  At DVI, the evidence shows that

11  prison officials were responsive to plaintiff's request to establish a Rastafarian religious program

12  at this institution.  Thus officials' failure to make a Rastafarian minister available to plaintiff did

13  not violate the latter's First Amendment rights.

14              Nor did prison officials' failure to provide a particular outdoor area and/or an

15  administrative building for Rastafarians violate plaintiff's right to free exercise.  Rastafarians

16  were not prohibited from using the chapels at CMF for services, subject to availability.  By the

17  time plaintiff left CMF, Rastafarian group services at CMF were scheduled for Tuesday

18  afternoons in Chapel B.  Defendants also cited "a valid and rational connection" between prison

19  security interests and the denial of plaintiff's request to use the courtyard outside the chapels for

20  Rastafarian services.  Instead, plaintiff and other Rastafarian inmates were allowed to hold

21  religious meetings in a secure outdoor area until a minister for a chapel meeting became available.

22  Thus plaintiff's right to free exercise was not violated based on the location of Rastafarian group

23  activities.

24              As to plaintiff's request for artifact chronos, it appears that, while consistently

25  acknowledging that Rastafarian inmates were entitled to possess certain religious items, CMF

26  officials delayed issuing renewed artifact chronos to plaintiff for more than a year: throughout

2010 and for an unknown period of time prior to that.  The reasons ranged from simple bureaucratic delay (waiting for the chronos to be retyped, reviewed, and signed), to a directive to Polisak not to issue any new religious chronos pending committee review, in order to ensure that prisons responded consistently to inmate requests.  It appears that, even without the renewed chronos, plaintiff was allowed to possess certain, previously-approved religious items during this period, such as headwraps.  However, drawing all reasonable inferences in plaintiff's favor, the court will assume that plaintiff was not able to possess certain, previously-approved religious items due to a lengthy delay in the issuance of new chronos.

In an apparent attempt to address this problem, Polisak met with plaintiff in 2011 and advised him that an outside donor could send religious items directly to Polisak to review, who would then pass them on to inmates.  However, these instructions were not followed, and the items were returned to the donor as unauthorized and never re-sent.

In May 2012, DVI officials issued a chrono to plaintiff authorizing him to possess numerous religious items.  His request for injunctive relief on this basis is therefore moot.  The question is whether the delayed issuance of religious chronos at CMF could give rise to damages liability for either defendant Dickinson or Cate under section 1983.  Regarding the former, plaintiff has not shown that Warden Dickinson was directly involved in the delay in issuing 2010 religious chronos.  The evidence shows that non-defendants Mirich and Polasik were responsible for addressing inmates' religious needs, including, presumably, having the chronos "re-typed" and processed in a timely manner.  Certainly Dickinson was not responsible for the fact a donor sent religious items directly to plaintiff rather than to Polasik for review in 2011, resulting in the items' being sent back to the donor.  Nor is there any evidence that the delays were based on a constitutionally-deficient CMF policy.  Thus Dickinson is entitled to summary judgment on this issue.

As to defendant Cate, one reason plaintiff's chronos were delayed was that Polasik was advised (by whom, it is not known) that no new religious chronos should be issued until a

1    Wardens' committee could ensure that prisons responded consistently to inmates' requests.

2    Construing this directive as some sort of policy, the court lacks sufficient information about it to

3    determine whether it was reasonable under the factors set forth in Turner, 482 U.S. at 89-90.  For

4    example, the record does not indicate how long this policy was in place.  See Cannell v. Lightner,

5    143 F.3d 1210, 1215 (9th Cir. 1998) ("relatively short-term and sporadic" intrusion on inmate's

6    religious practice was not a "substantial burden" on free exercise).  However, plaintiff has not

7    produced any evidence that Cate was involved in implementing the formal or informal policy of

8    temporarily delaying new religious chronos, or even knew about it.  Thus Cate is entitled to

9    summary judgment on this ground.

10           Regarding the lack of a religious vendor, plaintiff has not shown that either

11   defendant was directly involved in delaying or denying the approval of a Rastafarian vendor at

12   CMF.  In response to plaintiff's 2009 and 2010 grievances, non-defendant officials stated that a

13   vendor "would be established"; "has been approved"; and could "fill [plaintiff's] religious artifact

14   requirements," respectively.  Plaintiff was also advised to have an outside party send religious

15   items directly to Polasik for approval and distribution to inmates.  At DVI, as noted above,

16   plaintiff was provided a memo of CDCR procedures for the purchase of religious artifacts "and

17   sent by the vendor to DVI."  (Dkt. No. 29 at 24.)  Even assuming arguendo that the lack of an

18   approved vendor for an unspecified period of time substantially burdened plaintiff's religious

19   exercise, neither defendant is causally linked to this problem by the evidence presented.  Both are

20   entitled to summary judgment on this ground.

21   B. Equal Protection

22           The Equal Protection Clause requires that persons who are similarly situated be

23   treated alike.  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439(1985).  An

24   equal protection claim may be established by showing that the defendant intentionally

25   discriminated against the plaintiff based on the plaintiff's membership in a protected class,

26   Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003), or that similarly situated individuals

1  were intentionally treated differently without a rational relationship to a legitimate state purpose,

2  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Lazy Y Ranch Ltd. v. Behrens, 546

3  F.3d 580, 592 (9th Cir. 2008).  In the prison context, a prisoner must demonstrate that his

4  treatment is invidiously dissimilar to that received by other inmates.

5  Here, plaintiff has not shown that similarly situated inmates were intentionally

6  treated differently without a rational relationship to a legitimate state purpose.  Plaintiff asserts

7  that other religious groups at CMF were provided either a paid or volunteer minister, while the

8  Rastafarians were not provided a dedicated minister.  He also asserts that inmates of other

9  religions had an "individual place of worship" while the Rastafarians did not.  (Dkt. 1 at 4.)

10  First, plaintiff has not shown that he is similarly situated to inmates belonging to

11  other religious groups.  A small number of inmates at CMF identified as Rastafarian during the

12  relevant period, and at DVI, there was apparently no Rastafarian program prior to plaintiff's

13  arrival.  Prison officials are not required to provide exactly the same accommodations to large and

14  small religious groups alike.  See Cruz, 405 U.S. 322 n.2.

15  Second, plaintiff has not shown that he received dissimilar treatment not rationally

16  related to a legitimate state purpose.  Plaintiff was allowed to participate in group religious

17  activities at scheduled times, like inmates of other religions.  Prison officials provided chapel

18  time, chaplains, and other staff to facilitate the Rastafarian religious program and allowed inmate

19  volunteers and outside vendors, as with other religious groups.  Rastafarians were allowed to

20  possess headwraps, medallions, banners, pictures, and other religious items, subject to certain

21  safety regulations and the 2010 delay described above.  Although plaintiff did not receive renewed

22  artifact chronos in 2010, he has not shown that inmates of other faiths were treated differently, or

23  that the no-renewal directive did not apply across the board to inmates of all religions.  Nor has

24  plaintiff shown intentional discrimination.  Thus defendants are entitled to summary judgment on

25  plaintiff's equal protection claim.

26  \\\\\

C.  Due Process

Plaintiff alleges that defendants' interference with his religious exercise denied him due process under the Fourteenth Amendment.  If a claim implicates a specific constitutional right, the claim should be analyzed under that standard and not under the Due Process Clause. Armendariz v. Penman, 75 F.3d 1311, 1318 (9th Cir. 1996), overruled in part on other grounds as stated in Crown Point Dev., Inc. v. City of Sun Valley, 506 F.3d 851, 852-853 (8th Cir. 2007). "The scope of substantive due process does not extend to areas addressed by other, more specific provisions of the Constitution."  Id. at 1326.  Here, plaintiff's religious exercise claim must be analyzed under the First Amendment and his religious discrimination claims under the Equal Protection Clause of the Fourteenth Amendment, as discussed above.

Accordingly, IT IS HEREBY RECOMMENDED THAT:

1.  Defendants' March 9, 2012 motion for summary judgment (Dkt. No 21) be granted; and

2.  This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 25, 2013

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 - blan0171.msj