1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   THOMAS BLANKS,

11          Plaintiff,                    No. 2:11-cv-0171 WBS CKD P

12     vs.

13   MATTHEW CATE, et al.,                AMENDED FINDINGS

14          Defendants.                   AND RECOMMENDATIONS[1]

15   _____/

16   I. Introduction

17          Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action

18   seeking relief under 42 U.S.C. § 1983.  In the complaint filed January 19, 2011, plaintiff names

19   as defendants CDCR Secretary Matthew Cate and California Medical Facility Warden Kathleen

20   _____

21          [1] On March 8, 2013, the district court remanded this matter to the undersigned for further consideration in light of the Ninth Circuit's decision in Hartmann v. CDCR, 2013 WL 600215
22   (9th Cir., Feb. 19, 2013).  (Dkt. No. 38.)  In Hartmann, which concerned plaintiffs' religious practice of Wicca while incarcerated in a California prison, the Ninth Circuit affirmed the district
23   court's dismissal of plaintiffs' free exercise, equal protection, and RLUIPA claims.  The Ninth Circuit reversed the district court's determination that plaintiffs failed to state a claim under the
24   establishment clause and the California State Constitution, and remanded for further proceedings on these claims.  The undersigned discusses below the Ninth Circuit's determinations in
25   Hartmann as they relate to the instant findings and recommendations, noting that while Hartmann reviewed allegations under the Rule 12(b)(6) standard for failure to state a claim, the instant
26   findings are based on evidence adduced on summary judgment pursuant to Rule 56(c).  See id. at *4.

Dickinson.  (Dkt. No. 1 at 2[2].)  His allegations concern his religious practice of Rastafarianism while incarcerated at the California Medical Facility ("CMF") between 2004 and 2011.

Plaintiff alleges that defendants have "fail[e]d to hire or [procure] a Rastafarian Minister" and "fail[ed] to provide a separate outside area as space of worship and set[] up an Administration Office for affairs of the Rastafarian Minister-Staff."  He alleges that, while CDCR "recognizes Rastafarians a religion," Rastafarians are not provided accommodations similar to other religious groups at CMF.  Plaintiff alleges that defendants have "fail[ed] to provide Artifact chronos for Rastafarian[s] to possess religious items" and have "refused to provide the allowance of religious headgear (i.e., Tam or Turban) chronos for the wearing of religious ornament in the visiting room similar to Muslim and Jews being permitted to wear [religious headgear[.]"  He also alleges that defendants have "fail[ed] to provide a religious vendor for the Rastafarians as other faiths are granted."  (Id. at 4-5.)

Plaintiff claims that defendants substantially burdened his religious exercise under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA); and violated the free exercise and establishment clauses of the First Amendment and his Fourteenth Amendment rights to equal protection and due process.  He seeks damages against each defendant and the following injunctive relief: a Rastafarian minister, an outside worship area and minister administrative office, Rastafarian artifact chronos for religious items, and a vendor memorandum for Rastafarian prisoners.  (Dkt. No. 1. at 3-5.)

Pending before the court is defendants' March 9, 2012 motion for summary judgment.  (Dkt. No. 21.)  Plaintiff has filed an opposition (Dkt. No. 29) and defendants have filed a reply (Dkt. No. 31.)[3]  For the following reasons, the undersigned will recommend that defendants' motion for summary judgment be granted.

---

[2] Page citations are to page numbers assigned by the court's docketing system.

[3] On November 2, 2012, plaintiff filed an additional declaration (Dkt. No. 36), which the court will consider as evidence submitted in opposition to summary judgment.

II. <u>Summary Judgment Standards Under Rule 56</u>

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. <u>See</u> Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11. The opposing party

1    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5    return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6    1436 (9th Cir. 1987).

7            In the endeavor to establish the existence of a factual dispute, the opposing party

8    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

9    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

10   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

11   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

12   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

13   committee's note on 1963 amendments).

14           In resolving the summary judgment motion, the court examines the pleadings,

15   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

24   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

26   \\\\\

4

1    The court "is not required to comb through the record to find some reason to deny

2    a motion for summary judgment."  Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026,

3    1029 (9th Cir. 2001).  Instead the "party opposing summary judgment must direct the Court's

4    attention to specific triable facts."  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th

5    Cir. 2003).  Statements in a brief, unsupported by the record, cannot be used to create an issue of

6    fact.  Barnes v. Independent Auto Dealers, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

7    On May 18, 2011, the court advised plaintiff of the requirements for opposing a

8    motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 14.)  See Rand v.

9    Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999).  On

10   July 12, 2012, the court issued a second Rand notice to plaintiff pursuant to the Ninth Circuit's

11   recent decision in Woods v. Carey, No. 09-15548 (9th Cir. July 6, 2012).  (Dkt. No. 26.)

12   Plaintiff filed his opposition to summary judgment on September 14, 2012.  (Dkt. No. 29.)

13   III.  Facts

14   The following facts are undisputed unless otherwise noted:

15   Plaintiff was transferred to CMF on May 4, 2004.  (DUF 3.)  In January 2005,

16   plaintiff claimed he was a "Bobo Ashanti Rastafari" and asked to wear his hair in dreadlocks

17   covered by a religious headwrap.[4]  (DUF 4.)  Plaintiff was allowed to wear his hair in dreadlocks

18   and to have white or grey religious headwraps.  Plaintiff was not allowed religious headgear that

19   contained colors due to a safety and security-based policy to prevent the display of gang colors,

20   e.g., the color red, associated with the Bloods street gang.  (DUF 8.)

21   Between 2006 and 2008, plaintiff submitted three inmate appeals requesting

22   various accommodations for his Rastafarian religious practice, two of which were withdrawn.

23   (Defs.' Ex A, Mirich Decl,  ¶¶ 7-9.)  It does not appear that plaintiff exhausted administrative

24

25       [4]  Defendants ask the court to take judicial notice of facts about "Rastafarian Beliefs and

26   Practices" as described on the internet website Wikipedia.  The court declines this request as
     such information is not sufficiently reliable.  See Fed. R. Evid. 201(b)(2).

1   remedies as to the remaining grievance.  See 42 U.S.C. § 1997e(a).

2           On December 20, 2009, plaintiff submitted an inmate appeal in Log. No. CMF-

3   09-M-3233.  (Dkt. No. 21-3 at 54-55.)  At that time, non-defendant P. Mirich was the

4   Community Partnership Manager who oversaw religious programs for inmates at CMF.  (Defs.'

5   Ex A, Mirich Decl,  ¶ 2.)  Mirich interviewed plaintiff concerning the December 2009 appeal.

6   (DUF 11.)  This appeal was partially granted at the Second Level of review on February 11,

7   2010.  (Dkt. No. 21-3 at 56-58.)  An appeal of that decision was denied at the Director's Level of

8   review on May 24, 2010.  (Dkt. No. 1 at 28.)

9           While that appeal was pending, plaintiff submitted another appeal dated April 28,

10  2010 in Log. No. CMF-10-1033, renewing his requests for religious headgear and artifact

11  chronos.  (Dkt. No. 21-3 at 83-84.)  By this time, Mirich was no longer Community Partnership

12  Manager; Tim Polasik held that position.  However, Mirich again interviewed plaintiff.  (Defs.

13  Ex. A, Mirich Decl., ¶ 17.)  Polasik also met with plaintiff concerning his requests for religious

14  accommodations.  (DUF 25.)  Plaintiff's April 2010 appeal was partially granted at the First

15  Level of review on June 9, 2010.  (Id. at 85-86.)

16          CMF officials responded to plaintiff's requests as follows:

17  Rastafarian Minister

18          In his December 2009 grievance, plaintiff requested that a Rastafarian minister be

19  appointed at CMF.  If none could be found, plaintiff asked that an inmate be approved to

20  temporarily act as minister until one was provided.  Plaintiff provided the name and address for

21  the Royal Apostles of Haile Selassi in Oakland, California as a contact in locating a Rastafarian

22  representative.  (DUF 10.)

23          In February 2010, the Second Level reviewer stated:

24          A review of other religious groups here at CMF show that they
            either have a designated chaplain, a contract employee or a
25          volunteer from the community to oversee their services.  Mr. W.
            Forbes, a current CMF employee was assisting with the Rastafarian
26          group; however, due to regulations he was informed that he could

6

no longer assist during his time off.  Currently the Imam (the Islamic Chaplain) is assigned to tend to the religious/spiritual needs of the inmates of the Rastafarian Faith.  [These inmates], per their own request, are currently assigned to meet for worship services in Chapel B on Mondays from 13:00 to 14:00 hours.  Due to Monday's being the Imam's day off, when the new Catholic Chaplain is hired, he will be assigned as the person to tend to the Rastafarian needs.  Mr. Forbes and I are currently canvassing the local community for a leader of the Rastafarian Faith who would be willing to volunteer to lead the worship services.  If you are requesting an inmate be permitted to assume the role of minister of the group until a volunteer is located, I refer you to [Department regulations]. . . . Any inmate who feels he is qualified to perform this task may author a memorandum to the Warden stating their request to be considered a temporary minister and list their qualifications.

(Dkt. No. 21-3 at 56-57.)

The Second Level reviewer further determined that "there are currently not enough inmates of the Rastafarian Faith here at CMF to warrant hiring a staff minister, however CMF is actively seeking a volunteer from the outside community to hold the services you are requesting."  (Id. at 57.)  Similarly, on Director's Level review, the reviewer stated that "a full time Rastafarian minister will not be considered due to the small group that practices the faith; however, the community partnership manager is actively seeking a volunteer from the community."  (Dkt. No. 1 at 28.)  From lists submitted by plaintiff, it appears that from July 2006 to August 2011, between 14 and 18 inmates at CMF identified as Rastafarian.  By late November 2011, 21 inmates identified as Rastafarian.  (Dkt. No. 29 at 30-32.)

Plaintiff did not subsequently make a request showing that he was qualified to lead Rastafarian services.[5]  (DUF 11.)

_____

[5] Plaintiff notes that in a July 2006 grievance, No. CMF-06-M-1473, he "clearly outline[d] his request to be the representative of the Rastafarian collective."  (Dkt. No. 29 at 6; see Dkt. No. 21-3 at 37-39.)  In an August 2006 decision, the Second Level reviewer stated that plaintiff's request "is denied at this time due to the safety and security of the institution, meaning there must be a staff representative present during these services."  (Dkt. No. 21-3 at 41.)  As a general rule, inmate ministers are not approved because of the potential for conflict and undue influence over other inmates.  (DUF 30.)  In plaintiff's case, there had been some conflict between plaintiff and other Rastafarian inmates over the question of whether the religion allowed

1    In his declaration, Polasik states that plaintiff asked him to schedule Rastafarian

2    group services on Saturdays.  Polasik states that, during this time, there was a shortage of

3    chaplains available to facilitate inmate religious programs, and the prison was in the process of

4    filling a vacant position.  As a temporary solution, plaintiff and other Rastafarians were allowed

5    to meet outside in a fenced area between the outside areas used by nature-based religious groups,

6    like the Wiccan and Odinists, and the Native American spiritual grounds.  That area was under

7    direct observation and supervision by officers.  When the vacant chaplain position was filled, the

8    Rastafarian service was again scheduled in the chapel.  (DUF 29.)

9    In opposition to summary judgment, plaintiff asserts that Rastafarian inmates at

10   CMF were "denied services" for almost a year "because CDCR never hired a Catholic priest."

11   (Dkt. No. 29 at 5.)  In sum, it appears that for a period of several months at CMF, due to

12   scheduling and staffing issues, Rastafarian inmates were allowed to meet outside in a fenced area

13   near where other religious groups met, but were not led by a chaplain or an inmate minister.

14   As of December 2, 2011, Rastafarian group services at CMF were scheduled for

15   Tuesday afternoons in Chapel B, led by the Islamic chaplain.  (Dkt. No. 21-3 at 89.)

16   Place of Worship

17   In his December 2009 grievance, plaintiff asked that an outside area be made

18   available for Rastafarian worship.[6]  Plaintiff claimed that an outside area was needed because

19   Rastafarians were not allowed to burn incense, engage in drumming and chanting, or play music

20   recordings in the chapel.

21

22   homosexuality.  Plaintiff also had a number of disciplinary actions in his record.  (Id.)

23   [6]  The fenced area where Rastafarian services were held in 2010 was not the outside area
     plaintiff requested.  Plaintiff specifically "asked that a courtyard area outside Chapels A and B be
24   opened" for Rastafarian religious use.  (DUF 10.)  However, for safety and security reasons,
     inmates were not allowed to access the courtyard area outside the chapels. The courtyard is
25   located near the unit at CMF where administrative segregation inmates are housed, and access to
     the courtyard is restricted to prevent communication between the administrative segregation
26   inmates and other inmates.  In the past, an inmate attempted to escape by climbing from the
     courtyard onto the roof of an adjoining building.  (DUF 22.)

1    Plaintiff was apparently mistaken about certain activities being banned in the

2   chapel.  In February 2010, the Second Level reviewer stated that there was "no security issue if a

3   Rastafarian drum service is held inside of Chapel B during a scheduled worship service."  In a

4   later meeting, Polasik also told plaintiff that religious drumming or chanting or the playing of

5   music was allowed in the prison's chapels.  (DUF 28.)

6    However, the Second Level reviewer stated, "[t]he authorizing of the use of

7   incense for your religious service must first go through the Religious Review Committee for

8   initial approval.  Please document this request . . . and send it to the office of the Community

9   Partnership Manager for processing."  (Dkt. No. 21-3 at 57.)  The burning of incense also had to

10  be approved by the prison's Fire Chief, as open flame devices could be allowed for ceremonial

11  purposes if they did not pose a fire hazard.  (DUF 17-21.)  Plaintiff did not document a religious

12  need to burn incense for Rastafarian group services and did not submit a request for approval.

13  (DUF 15.)

14    On Director's Level review, it was noted that plaintiff's request "for a secondary

15  place of worship was denied."  (Dkt. No. 1 at 28.)

16    As described above, Rastafarian inmates were assigned to a fenced outdoor area

17  for worship services at CMF until a chaplain and/or chapel space was available.  Plaintiff

18  subsequently requested that Rastafarian inmates be allowed to resume services in the chapel.  On

19  First Level review of plaintiff's April 2010 grievance, the reviewer states: "Lieutenant Mirich has

20  . . . informed me that you are requesting time in Chapel B on Sunday to hold a worship service.

21  This information has been passed on to Mr. Polasik who will review the current chapel schedule

22  and get with you to find a better time for your services."  (Dkt. No. 21-3 at 85.)  As noted above,

23  by December 2011, the Rastafarians were scheduled for weekly services facilitated by an Islamic

24  chaplain in Chapel B.

25  Religious Artifact Chronos

26    In his December 2009 grievance, plaintiff asked that prison officials provide

9

1  religious chronos allowing him to have a portrait of Emperor Haile Selassie; a Lion of Judah

2  Banner; religious headgear and permission to wear it in the visiting room; a religious necklace or

3  bracelet with the colors red, green, and gold; oils and incense; and recordings of drumming and

4  chanting.  His exhibits to the grievance included a November 2005 religious chrono showing that

5  he was allowed to have dreadlocks and an October 2006 chrono showing that he was allowed to

6  carry a Lion of Judah banner to and from Rastafarian services.  (Dkt. No. 21-3 at 72-73.)

7                 In response, the Second Level reviewer stated:

8          [N]ew chronos for 2010 are currently being retyped and will be
   distributed to inmates of the Rastafarian Faith as soon as they are

9          completed and signed.  These chronos will include all items
   currently authorized for wear/possession by inmates of the

10         Rastafarian Faith.  These items will also be included in the updated
   CMF D.O.M. Supplement of Section 101060.

11

12 (Dkt. No. 21-3 at 57.)  The Director's Level decision in May 2010 similarly stated: "[N]ew

13 chronos are being prepared that will list those items approved for Rastafarian worship."  (Dkt.

14 No. 1 at 28.)

15                In his April 2010 grievance, plaintiff complained that, although he had been told a

16 meeting would take place to resolve his request for artifact chronos, no such meeting had

17 occurred and he still had not received approval for these items.

18                In his June 2010 response, the First Level Reviewer stated:

19         These chronos are in the possession of the Community Resources
   Manager, [Polasik].  Mr. Polasik has reviewed the chronos and is

20         forwarding them to Administration for review/approval of the
   items and then to the Warden for final approval and her signature.

21         Once these chronos are signed, you will be given a copy which
   allow all documented members of the Rastafarian faith group to

22         possess the approved items listed on the chrono.

23 (Dkt. No. 21-3 at 85.)

24                In a declaration, Polasik states plaintiff did not receive new religious chronos

25 before he left CMF in December 2011.  Polasik states that he was advised not to approve

26 religious accommodations through the issuance of new chronos because a Wardens' Advisory

1  Group was reviewing all new religious accommodation requests in an effort to ensure that

2  requests from inmates at different institutions were treated consistently.  Defendants assert that

3  plaintiff continued to be allowed to practice Rastafarianism and have previously approved items

4  and accommodations, even though the new religious chronos were not issued.  (DUF 31.)

5          From the record, it is not clear exactly what items plaintiff was allowed to possess

6  while awaiting the issuance of new religious chronos in 2010.  Plaintiff's evidence includes an

7  August 2006 chrono stating he was approved "to possess and carry the Rastafarian religious

8  artifact 'Lion of Judah' banner, to and from religious services," which expired in August 2007.

9  (Dkt. No. 29-1 at 6).  A December 2011 property inventory states that plaintiff possessed grey

10  and white Rasta hats. (Dkt. No. 29 at 47).  In sworn declarations, three CMF Rastafarian inmates

11  state that they witnessed plaintiff receive a "picture of Haile Selassie at the Rastafarian service

12  that was given to him by the Community Project Manager Tim Polasik."  They also state that

13  plaintiff possessed "a Rastafarian religious banner and two head-gear turbans[,]" but do not

14  specify when these events occurred.   (Id. at 48-53.)  In his declaration, Mirich asserts that

15  plaintiff would have been allowed to bring an approved religious banner to group services and

16  would have been allowed to have a portrait of Emperor Haile Selassi.  Plaintiff would also have

17  been allowed to have a religious medallion and chain with an approved symbol, but not colored

18  medallions, for the same safety and security reasons that applied to religious headgear.  (DUF

19  13.)

20          At his meeting with Polisak, plaintiff requested chronos allowing him to keep

21  certain religious items in his cell for personal use, but also bring them to Rastafarian meetings.

22  As a general rule, an inmate is allowed a religious picture, religious books like a Bible, and an

23  approved religious medallion for personal use.  Other, larger items would be allowed for group

24  religious use but otherwise kept by prison staff.  (DUF 26.)

25          Plaintiff said he had an outside person willing to donate the items he wanted.

26  Polasik told plaintiff to have the donor send Polasik the items to review to determine if they

1  would be allowed.  Contrary to Polasik's instructions, the donated items were sent directly to

2  plaintiff, and staff returned them to the sender as unauthorized.  Polasik told plaintiff he could

3  contact the donor and have the items resent to Polasik as instructed.  The donor did not resend

4  the items.  (Id.)

5  Religious Vendor

6        In his December 2009 grievance, plaintiff asked that a Rastafarian vendor be

7  approved so that inmates could purchase approved Rastafarian religious artifacts.

8        In February 2010, the Second Level reviewer stated: "Please have the inmates of

9  the Rastafarian faith submit a list of requested vendors and these vendors will be reviewed by the

10  Community Partnerships Manager.  A vendor or vendor for approved Rastafarian items will be

11  established."  (Dkt. No. 21-3 at 57.)

12        In May 2010, the Director's Level reviewer noted: "[A] vendor has been

13  approved and the institution is awaiting the names and addresses of those who can provide the

14  approved Rastafarian items and artifacts."  (Dkt. No. 1 at 28.)

15        In a June 2010 response to plaintiff's April 2010 grievance, the First Level

16  Reviewer stated: "You have given Lieutenant Mirich the name and address of a vendor who can

17  fill your religious artifact requirements.  This information will be passed on to Mr. Polasik who

18  will complete the required documents to grant this part of your request."  (Dkt. No. 21-3 at 85.)

19  The reviewer further noted that a meeting was scheduled on June 15, 2010 "in order to finalize

20  any outstanding issues in regards to the Rastafarian faith" and that plaintiff's religious requests

21  were "being processed for approval as long as they meet all required policies and procedures."

22  (Id. at 85-86.)

23        Plaintiff was transferred from CMF to Deuel Vocational Institution-Main (DVI)

24  on December 22, 2011.  (DUF 1.)  One month later, plaintiff submitted an inmate appeal

25  requesting the same religious accommodations that he seeks in the instant complaint, filed on

26  January 19, 2011.  (Dkt. No. 29 at 21.)  A May 13, 2012 chrono from DVI states that plaintiff is

1   authorized to possess numerous Rastafarian items.  These include a religious medallion and

2   chain; religious literature purchased from an approved vendor; photos of "religous symbols or

3   personalities"; white, black, or gray turbans or tams; 4 oz. of ceremonial fragrance; 3 compact

4   discs of Rasta worship music quarterly; and a photo of a banner.  The chrono states that

5   "[r]eligious head coverings, medallions or public approved artifacts may be worn in the Housing

6   Units, Corridors, Yards, Dining Halls, Visiting Rooms religious meeting rooms, Board/Review

7   hearings and work assignments at the discretion of the supervisor relative to safety concerns."

8   (Id. at 23.)

9            DVI also issued a May 9, 2012 memorandum in response to plaintiff's "inquiries

10  regarding the purchase of religious artifacts, and approval for Rastafarian services for groups of

11  inmates[.]"  The memo describes CDCR procedures for "the purchase of religious artifacts"

12  through inmates' trust accounts or by a third party.  The memo stated that, as of May 2012, there

13  was "no prior history" of Rastafarian services at DVI.  It outlined the process for establishing a

14  new religious practice at DVI, including an inmate needs assessment, a resource assessment, and

15  other steps.  The memo indicated that, as of May 2012, DVI staff were "near the end of the

16  Needs Assessment phase (due to the Lock-Down) and at the beginning of the resource

17  assessment, appropriations stage of establishing Rastafarian services at DVI."  (Id. at 24.)

18  IV.  RLUIPA

19            Plaintiff claims that defendants substantially burdened his religious exercise of

20  Rastafarianism at CMF.  The RLUIPA provides:

21            No government shall impose a substantial burden on the religious
            exercise of a person residing in or confined to an institution ... even
22            if the burden results from a rule of general applicability, unless the
            government demonstrates that imposition of the burden on that
23            person (1) is in furtherance of a compelling government interest;
            and (2) is the least restrictive means of furthering that compelling
24            government interest.

25  42 U.S.C. § 2000 cc-1(a). "RLUIPA defines 'religious exercise' to include 'any exercise of

26  religion, whether or not compelled by, or central to, a system of religious belief.' " Greene v.

1  Solano County Jail, 513 F.3d 982, 986 (9th Cir. 2008) (quoting 42 U.S.C. § 2000cc-5(7)(A)).

2  RLUIPA "mandates a stricter standard of review for prison regulations that burden the free

3  exercise of religion than the reasonableness standard under Turner." Shakur v. Schriro, 514 F.3d

4  878, 888 (9th Cir. 2008) (citing Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005)).

5  Plaintiff bears the initial burden of demonstrating that defendants substantially burdened the

6  exercise of his religious beliefs. Warsoldier, 418 F.3d at 994-95. "A 'substantial burden' on

7  'religious exercise' must impose a significantly great restriction or onus upon such exercise." Id. at

8  995 (citing San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004)).

9        Before turning to the parties' evidence, the court considers what type of relief is

10  available to plaintiff against defendants Cate and Dickinson under RLUIPA.

11        Plaintiff seeks compensatory damages against defendants, but does not indicate

12  whether he is suing them in their official or individual capacities. If the former, official-capacity

13  damages under RLUIPA are barred by the state's Eleventh Amendment sovereign immunity.

14  Sossamon v. Texas, 131 S. Ct. 1651, 1663 (2011); Holley v. California Dept. of Corrections, 599

15  F. 3d 1108, 1114 (9th Cir. 2010) ("The Eleventh Amendment bars Holley's suit for official-

16  capacity damages under RLUIPA.")

17        As to whether individual damages are available under RLUIPA, the United States

18  Supreme Court has not resolved this question and Ninth Circuit Court of Appeals has expressly

19  reserved the issue. See Florer v. Congregation Pidyon Shevuyim, N.A., 639 F.3d 916, 922 n. 3

20  (9th Cir. 2011) ("Defendants do not challenge, and we do not decide, RLUIPA's application to

21  private actors sued for damages in their individual capacity .... The Ninth Circuit has not ruled on

22  this issue in a precedential opinion, and we reserve this question for another day.").

23        However, five circuit courts have held that RLUIPA does not authorize suits for

24  damages against government officials in their individual capacities. See Stewart v. Beach, — F.3d

25  ----, 2012 WL 6582331, at *8 (10th Cir. Dec. 18, 2012); Rendelman v. Rouse, 569 F.3d 182,

26  187-89 (4th Cir. 2009); Sossamon v. Texas, 560 F.3d 316, 327-29 (5th Cir. 2009); Nelson v.

1  Miller, 570 F.3d 868, 886-89 (7th Cir. 2009); Smith v. Allen, 502 F.3d 1255, 1271-75 (11th Cir.

2  2007).  Most courts have assessed Congress's power to enact RLUIPA as stemming from its

3  Article I spending power.  See generally Nelson, 570 F.3d at 886.  These courts have reasoned

4  that, because individual officers are not the recipients of federal funds, Congressional enactments

5  pursuant to the Spending Clause do not impose liability on individual defendants.  Several district

6  courts in the Ninth Circuit have also concluded that RLUIPA does not authorize suits for damages

7  against government officials in their individual capacities.  Kindred v. California Department of

8  Mental Health, No. 1:08-cv-1321-AWI-GSA-PC, 2011 WL 2709104, at *8-9 (E.D. Cal. July 12,

9  2011) (and cases cited therein); Birdwell v. Cates, No. Civ. S-10-0719 KJM GGH P, 2012 WL

10  1641964, at *9 (E.D. Cal. May 9, 2012) (and cases cited therein).  See also Washington v. Brown,

11  No. 2:06-cv-1994 WBS DAD (PC), 2012 WL 3704847, at *2-7 (E.D. Cal. Aug. 24, 2012),

12  (adopted insofar as consistent with district court order issued October 5, 2012).  The undersigned

13  finds no reason to depart from the Fourth, Fifth, Seventh, Tenth and Eleventh Circuits and various

14  Ninth Circuit district courts in concluding that RLUIPA does not create a damages remedy against

15  individual defendants.  Thus defendants are entitled to summary judgment on plaintiff's damages

16  claims under RLUIPA.

17       As to plaintiff's requested injunctive and declaratory relief, the complaint seeks

18  such relief based on prison policies and conduct of officials at CMF.  Plaintiff was transferred to

19  DVI on December 22, 2011.  Generally, when an inmate seeks injunctive or declaratory relief

20  concerning the prison where he is incarcerated, his claims for such relief become moot when he is

21  no longer subjected to those conditions.  Nelson v. Heiss, 271 F.3d 891, 897 (9th Cir. 2001);

22  Dilley v. Gunn, 64 F.3d 1365, 1368 (9th Cir.1995); Johnson v. Moore, 948 F.2d 517, 519 (9th

23  Cir.1991).  Thus plaintiff's claims for injunctive relief against defendant Warden Dickinson

24  should be denied as moot.

25       In his opposition to summary judgment, plaintiff argues that prison officials at DVI

26  perpetuated the challenged policies at CMF.  (Dkt. No. 29 at 9-10.)  Plaintiff's claims for

1    injunctive and declaratory relief against Secretary Cate (or rather, his successor under Federal

2    Rule of Civil Procedure 25(d)) are not mooted by his transfer to another prison insofar as

3    plaintiff's claims concern CDCR practices, policies, or procedures.[7]  See Nelson, 271 F.3d at 897.

4    Thus the remaining issue is whether defendant Cate is entitled to summary judgment on plaintiff's

5    RLUIPA claims for injunctive and declaratory relief.

6           The court first considers whether plaintiff has shown that his exercise of religious

7    belief was substantially burdened by CDCR policies, practices, or procedures.  Here, the answer is

8    no.  Prison officials at CMF declined to hire a Rastafarian chaplain, citing the relatively small

9    number of Rastafarian inmates.[8]  However, chaplains of other faiths were assigned to facilitate

10   Rastafarian services, which were held either in the chapel or, for some months, in a secure outside

11   area where other religious groups met.  Even though Rastafarians at CMF lacked any chaplain for

12   several months, this was due to scheduling and staffing constraints specific to CMF.  Plaintiff or

13   another Rastafarian inmate could have applied to lead the group until a chaplain was appointed,

14   but did not.  In any case, with respect to chaplaincy issues specific to CMF, defendant Cate would

15   not be the proper defendant for injunctive relief.

16          Plaintiff's request for a "separate outside area as space of worship" at CMF has

17   also been mooted by his transfer to DVI and is institution-specific.  Plaintiff points to no CDCR

18   _____

19          [7]  For claims seeking injunctive relief in which a state practice, policy, or procedure is
     attacked on federal grounds, it is not necessary to allege the personal involvement of a state

20   official if the practice, policy, or procedure relates in some way to the job duties of the named
     defendant. Ryles v. Felker, 2008 WL 1901231, at *3 (E.D. Cal. Apr.28, 2008). "All that is

21   required is that the complaint name an official who could appropriately respond to a court order
     on injunctive relief should one ever be issued." Id. See also Rouser v. White, 707 F. Supp. 2d

22   1055, 1066 (E.D. Cal. 2010) (proper defendant for injunctive relief regarding implementation of
     a CDCR policy would be the Secretary of the CDCR in his official capacity or, to the extent that

23   the policy is institution-specific, the warden in his official capacity).

24          [8]  In McCollum v. CDCR, 647 F.3d 870, 874-75 (9th Cir. 2011), the Ninth Circuit set
     forth a detailed description of CDCR's historical and current policies with respect to its

25   chaplaincy program, including the criteria CDCR uses "in determining the need for a given paid
     chaplaincy position." See Hartmann, 2013 WL 600215, *12, n.4 (noting same). In Hartmann,

26   the Ninth Circuit held that plaintiffs did not state a claim under RLUIPA as they failed to plead
     that defendants substantially burdened the exercise of their religious beliefs. Id. at *8.

policy, practice, or procedure that precludes him from drumming, chanting, or burning incense as part of his religious practice, the latter subject to appropriate review for fire safety.  Plaintiff also requests an administrative office for a Rastafarian minister, but the lack of this facility cannot be construed as a "substantial burden" on plaintiff's religious exercise.

As to plaintiff's request for chronos allowing him to possess various Rastafarian items, his requests to CMF officials have been mooted, and the evidence shows he is allowed to possess numerous religious artifacts and headgear at DVI.  He has not shown that any CDCR policy, practice, or procedure is burdening his religious exercise in this regard.

Similarly, while plaintiff suffered some delay in the approval of a Rastafarian religious vendor at CMF, this request has been mooted by his transfer to DVI.  A May 2012 memorandum submitted by plaintiff outlines CDCR procedures for inmates' purchase of religious articles through outside vendors.  Insofar as plaintiff is seeking DVI's approval of a specific vendor of Rastafarian items, that is a DVI-specific issue and does not implicate defendant Cate.

At DVI, non-defendant prison officials appear responsive to plaintiff's request to establish a Rastafarian religious program through institutional procedures.  Because plaintiff has not shown that any CDCR policy, practice, or procedure has substantially burdened his access to religious services, no injunctive relief against defendant Cate is warranted on this basis.  Thus both defendants should be granted summary judgment on the RLUIPA claims.

V.  § 1983

The Civil Rights Act provides as follows:

> Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

1   (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

2   meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits

3   to perform an act which he is legally required to do that causes the deprivation of which complaint

4   is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

5            In Hartmann, the Ninth Circuit determined that defendants Secretary Cate and

6   Warden Lattimore were properly sued in their official capacities for the purposes of plaintiffs'

7   establishment clause claim.  2013 WL 600215, at *10.  Plaintiffs sought "an affirmative

8   injunction requiring prison administration to adopt and apply neutral criteria in determining

9   chaplain hiring needs at [Central California Women's Facility], which operates under CDCR

10  control."  Id.  The Ninth Circuit concluded that, because Cate and Lattimore would be the most

11  appropriate defendants to execute any court-ordered injunctive relief on this claim, they were

12  proper official-capacity defendants.  Id. at **9-10.

13           Here, as plaintiff's claims for injunctive relief against CMF Warden Dickinson

14  were mooted by his transfer, Dickinson is not a proper official-capacity defendant.  As to

15  defendant Cate, insofar as plaintiff can be said to challenge a CDCR policy remediable by Cate,

16  this defendant is properly sued in his official capacity.  However, as to any institution-specific

17  relief plaintiff seeks, the order directing such relief would be best addressed to the Warden of

18  DVI, who is not a named defendant.

19           Insofar as defendants are sued in their individual capacities, liability under section

20  1983 arises only upon a showing of personal participation by the defendant.  Taylor v. List, 880

21  F.2d 1040, 1045 (9th Cir. 1989), citing Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979).

22  There is no respondeat superior liability under section 1983.  Id, citing Ybarra v. Reno

23  Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984).   However, on a theory

24  of "direct liability" under section 1983, a supervisory official is liable "even without overt

25  personal participation in the offensive act if supervisory officials implement a policy so deficient

26  that the policy itself is a repudiation of constitutional rights and is the moving force of the

1   constitutional violation." Redman v. County of San Diego, 942 F.2d 1435, 1447 (9th Cir. 1991).

2        A claim for injunctive relief, as opposed to monetary relief, may be made on a

3   theory of respondeat superior in a section 1983 action. See Peavy v. Rohlfing, 2012 WL 4364502,

4   at *3 (E.D. Cal. Sept. 20, 2012) (citing cases). For the reasons discussed above, any claims for

5   injunctive relief against defendant Dickinson are mooted by plaintiff's transfer to DVI. In fact, by

6   the time plaintiff left CMF in December 2011, nearly a year after filing the complaint, CMF

7   officials had addressed some of the issues plaintiff raises.

8   A. First Amendment

9      1. Free Exercise

10        In order for a prisoner to prove that his First Amendment right to free exercise of

11   his religion has been violated, he must show that his practice of his religion was burdened by the

12   prevention of his engaging in conduct mandated by his faith without any justification reasonably

13   related to interests concerning the care of committed persons. See Freeman v. Arpaio, 125 F.3d

14   732, 736 (1997) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). Several factors are relevant in

15   determining the reasonableness of the acts of prison officials. First, there must be a valid and

16   rational connection between the jail official's actions and the interest put forward to justify those

17   actions. Turner, 482 U.S. at 89. Second, the court must consider whether there are alternate

18   means of exercising the right impinged upon. Id. at 90. Third, the court must consider the impact

19   that accommodation of the asserted First Amendment right will have on guards, other inmates,

20   and prison resources. Id. Finally, the absence of alternatives is evidence of the reasonableness of

21   the restriction of the asserted First Amendment right. Id.

22        As to plaintiff's request for a Rastafarian chaplain, the Constitution does not

23   require prisons "to provide each inmate with the spiritual counselor of his choice." Allen v.

24   Toombs, 827 F.2d 563, 569 (9th Cir.1987). Prisons need only provide inmates with a "reasonable

25   opportunity" to worship in accord with their conscience. Id. The Constitution does not require

26   "that every religious sect or group within a prison - however few in number - must have identical

facilities or personnel.  A special chapel or place of worship need not be provided for every faith

regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent

of the demand.  But reasonable opportunities must be afforded to all prisoners to exercise the

religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."

Cruz v. Beto, 405 U.S. 318, 322 n.2 (1972).

Here, plaintiff has not shown that prison officials' failure to provide a Rastafarian

chaplain denied him a reasonable opportunity to exercise his faith.  Evidence submitted by

plaintiff indicates that less than 20 inmates at CMF identified as Rastafarian for most of the

relevant period.  The Rastafarians were assigned a Muslim chaplain to assist with their services

and a time slot for chapel worship.  However, for several months, when an unfilled position made

a chaplain unavailable to oversee Rastafarian services in the chapel, the Rastafarians met in an

outside area without a chaplain's assistance, near where other religious groups met.  Although

plaintiff was advised that he could request that he or another inmate be approved as a temporary

inmate minister, he never submitted such a request.  By December 2011, Rastafarians were again

scheduled for a weekly chapel slot, overseen by a paid Muslim chaplain.  During this period,

prison officials repeatedly acknowledged that Rastafarian inmates were entitled to religious

accommodations such as weekly gatherings, artifact chronos, special headgear, and permission to

drum, chant, and possibly burn incense in their ceremonies.  At DVI, the evidence shows that

prison officials were responsive to plaintiff's request to establish a Rastafarian religious program

at this institution.

In Hartmann, plaintiffs alleged that prison officials violated their First Amendment

right to free exercise of their religion by denying their requests for "a paid full-time Wiccan

chaplain."  Id. at *5.  The Ninth Circuit agreed with the district court that plaintiffs failed to state a

claim on this basis, concluding: "The Free Exercise Clause does not require prison administration

to provide Plaintiffs with more than that which they are currently receiving – i.e., the services of

staff chaplains and a volunteer Wiccan chaplain."  Id. 6.  Hartmann is not inconsistent with the

1  determination that, based on the evidence presented, plaintiff has not shown that prison officials'

2  failure to provide a Rastafarian chaplain denied him a reasonable opportunity to exercise his faith.

3            Nor did prison officials' failure to provide a particular outdoor area and/or an

4  administrative building for Rastafarians violate plaintiff's right to free exercise.  Rastafarians

5  were not prohibited from using the chapels at CMF for services, subject to availability.  By the

6  time plaintiff left CMF, Rastafarian group services at CMF were scheduled for Tuesday

7  afternoons in Chapel B.  Defendants also cited "a valid and rational connection" between prison

8  security interests and the denial of plaintiff's request to use the courtyard outside the chapels for

9  Rastafarian services.  Instead, plaintiff and other Rastafarian inmates were allowed to hold

10  religious meetings in a secure outdoor area until a minister for a chapel meeting became available.

11  Thus plaintiff's right to free exercise was not violated based on the location of Rastafarian group

12  activities.

13            As to plaintiff's request for artifact chronos, it appears that, while consistently

14  acknowledging that Rastafarian inmates were entitled to possess certain religious items, CMF

15  officials delayed issuing renewed artifact chronos to plaintiff for more than a year: throughout

16  2010 and for an unknown period of time prior to that.  The reasons ranged from simple

17  bureaucratic delay (waiting for the chronos to be retyped, reviewed, and signed), to a directive to

18  Polisak not to issue any new religious chronos pending committee review, in order to ensure that

19  prisons responded consistently to inmate requests.  It appears that, even without the renewed

20  chronos, plaintiff was allowed to possess certain, previously-approved religious items during this

21  period, such as headwraps.  However, drawing all reasonable inferences in plaintiff's favor, the

22  court will assume that plaintiff was not able to possess certain, previously-approved religious

23  items due to a lengthy delay in the issuance of new chronos.

24            In an apparent attempt to address this problem, Polisak met with plaintiff in 2011

25  and advised him that an outside donor could send religious times directly to Polisak to review,

26  who would then pass them on to inmates.  However, these instructions were not followed, and the

1  items were returned to the donor as unauthorized and never re-sent.

2          In May 2012, DVI officials issued a chrono to plaintiff authorizing him to possess

3  numerous religious items.  His request for injunctive relief on this basis is therefore moot.  The

4  question is whether the delayed issuance of religious chronos at CMF could give rise to damages

5  liability for either defendant Dickinson or Cate under section 1983.  Regarding the former,

6  plaintiff has not shown that Warden Dickinson was directly involved in the delay in issuing 2010

7  religious chronos.  The evidence shows that non-defendants Mirich and Polasik were responsible

8  for addressing inmates' religious needs, including, presumably, having the chronos "re-typed" and

9  processed in a timely manner.  Certainly Dickinson was not responsible for the fact a donor sent

10  religious items directly to plaintiff rather than to Polasik for review in 2011, resulting in the items

11  being sent back to the donor.  Nor is there any evidence that the delays were based on a

12  constitutionally-deficient CMF policy.  Thus Dickinson is entitled to summary judgment on this

13  issue.

14          As to defendant Cate, one reason plaintiff's chronos were delayed was that Polisak

15  was advised (by whom, it is not known) that no new religious chronos should be issued until a

16  Wardens' committee could ensure that prisons responded consistently to inmates' requests.

17  Construing this directive as some sort of policy, the court lacks sufficient information about it to

18  determine whether it was reasonable under the factors set forth in Turner, 482 U.S. at 89-90.  For

19  example, the record does not indicate how long this policy was in place.  See Cannell v. Lightner,

20  143 F.3d 1210, 1215 (9th Cir. 1998) ("relatively short-term and sporadic" intrusion on inmate's

21  religious practice was not a "substantial burden" on free exercise).  However, plaintiff has not

22  produced any evidence that Cate was involved in implementing the formal or informal policy of

23  temporarily delaying new religious chronos, or even knew about it, or that it was in fact the policy

24  of CDCR.  Thus Cate is entitled to summary judgment on this ground.

25          Regarding the lack of a religious vendor, plaintiff has not shown that either

26  defendant was directly involved in delaying or denying the approval of a Rastafarian vendor at

1  CMF.  In response to plaintiff's 2009 and 2010 grievances, non-defendant officials stated that a

2  vendor "would be established"; "has been approved"; and could "fill [plaintiff's] religious artifact

3  requirements," respectively.  Plaintiff was also advised to have an outside party send religious

4  items directly to Polasik for approval and distribution to inmates.  At DVI, as noted above,

5  plaintiff was provided a memo of CDCR procedures for the purchase of religious artifacts "and

6  sent by the vendor to DVI."  (Dkt. No. 29 at 24.)  Even assuming arguendo that the lack of an

7  approved vendor for an unspecified period of time substantially burdened plaintiff's religious

8  exercise, neither defendant is causally linked to this problem by the evidence presented.  Both are

9  entitled to summary judgment on this ground.

10        2.  Establishment Clause

11        The establishment clause, applicable to state action by incorporation through the

12  Fourteenth Amendment, states that "Congress shall make no law respecting an establishment of

13  religion."  U.S. Const. amend. I.  "The clause 'means at least' that [n]either a state nor the Federal

14  Government . . . can pass laws which aid one religion, aid all religions, or prefer one religion over

15  another."  Hartmann, 2013 WL 600215, at *8, citing Everson v. Bd. of Educ. of Ewing Twp., 330

16  U.S. 1, 8 (1947).

17        In Hartmann, plaintiffs challenged a CDCR policy to maintain paid chaplains for

18  five major religious faiths, while inmates of other faiths (such as Wicca) could be assisted by paid

19  staff chaplains belonging to one of the five faiths, or by volunteer chaplains ("the Policy").  2013

20  WL 600215, at *1.  Specifically, plaintiffs alleged there was no "neutral . . . criteria that are

21  applied or methods used by the CDCR . . . to determine which religions should have paid

22  chaplains or what other type of accommodations should be provided to inmates of various faiths."

23  Id. at *3.  Plaintiffs claimed the Policy constituted an endorsement of one religion over another in

24  violation of the Establishment Clause.  Id. at *8.

25        The Ninth Circuit concluded that the alleged absence of "neutral criteria" in

26  determining which religions were entitled to paid chaplains was sufficient to state a claim under

23

1  the Establishment Clause.  To determine whether the Clause was actually violated, it would be

2  necessary to review of "all the circumstances surrounding the defendants' decision[]" to limit paid

3  chaplains to five faiths, including a proposed CDCR-wide survey of inmate religious affiliation

4  and evidence as to "whether paid staff chaplains work only at the CCWF or are required to travel

5  to other prisons, jails, and correction facilities in the state." Id. at *9.

6         In the instant case, plaintiff asserts: "All of the major and minor religious faith

7  groups at (CMF) ha[ve] either hired or volunteer Religious-Ministers with the exception of the

8  Rastafarian.  The CDCR recognizes Rastafarians as a religious group but currently has no

9  Minister Staff via hiring or volunteering."  (Dkt. No. 1 at 4.)  Plaintiff's assertion that CDCR does

10 not employ Rastafarian ministers contrasts with the Hartmann plaintiffs' challenge to the

11 neutrality of a specific CDCR policy.  In the instant case, plaintiff essentially argues that a small

12 number of  Rastafarians at CMF should have had their own paid chaplain like inmates of certain

13 other faiths.  Yet as the Ninth Circuit notes in Hartmann, "Prisons are entitled to employ chaplains

14 and need not employ chaplains of each and every faith to which prisoners might happen to

15 subscribe . . . " Id. at *8, quoting Johnson-Bey-v. Lane, 863 F.2d 1302, 1312 (7th Cir. 1988).

16        Even construing plaintiff's complaint as challenging the Policy at issue in

17 Hartmann, plaintiff presents no evidence on summary judgment showing that the Policy violated

18 the establishment clause.  Moreover, the record before the court in the instant case sheds light on

19 "the circumstances surrounding [prison officials'] decision" to deny plaintiff's request for a paid

20 Rastafarian chaplain.  As of February 2010, a Second Level reviewer stated that "there are

21 currently not enough inmates of the Rastafarian Faith here at CMF to warrant hiring a staff

22 minister, however CMF is actively seeking a volunteer from the outside community to hold the

23 services you are requesting."  (Dkt. No. 21-3 at 57.)  As noted above, for most of the relevant

24 period, less than twenty inmates at CMF identified as Rastafarian.  (Dkt. No. 29 at 30-32.)  For a

25 period of some months, there was also a shortage of staff chaplains at CMF due to a vacant

26 position.  (DUF 29.)  However, by the time plaintiff left CMF in December 2011, a staff chaplain

1  was assisting Rastafarian group services in the chapel.  (Dkt. No. 21-3 at 89.)

2        In sum, the record before the court shows that (1) Rastafarianism is not one of the

3  five religions for which CDCR provides paid chaplains; (2) while plaintiff was at CMF, a small

4  number of CMF inmates identified as Rastafarian; (3) plaintiff and other Rastafarian inmates at

5  CMF were assisted by a staff chaplain when available; (4) in the absence of a staff chaplain, CMF

6  officials made some effort to find a community volunteer to lead Rastafarian services at CMF, and

7  inmates could also apply to be volunteer chaplains; and (5) CMF officials gave reasoned

8  responses to plaintiff's requests for a paid chaplain and other religious accommodations, citing

9  logistical issues of staffing, etc., but never suggesting that Rastafarianism was not a legitimate

10  religious faith entitled to accommodation.  Based on this record, the undersigned does not find

11  that plaintiff has created a genuine dispute of fact as to whether defendants' failure to provide a

12  paid Rastafarian chaplain violated the establishment clause.[9]

13  B.  Equal Protection

14        The Equal Protection Clause requires that persons who are similarly situated be

15  treated alike.  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985).  An

16  equal protection claim may be established by showing that the defendant intentionally

17  discriminated against the plaintiff based on the plaintiff's membership in a protected class,

18  Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003), or that similarly situated individuals

19  were intentionally treated differently without a rational relationship to a legitimate state purpose,

20  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Lazy Y Ranch Ltd. v. Behrens, 546

21

22       [9] The Hartmann court further determined that, for the reasons underlying its federal
23  establishment clause determination, plaintiff stated a claim that defendants Cate and Lattimore
violated the establishment clause of the California Constitution.  Id. at **11-12.  Here, insofar as
24  plaintiff seeks to allege a violation of the California Constitution (see Dkt. No. 1 at 18), he has
not raised a genuine dispute of fact that his state constitutional rights to religious freedom were
25  violated by defendants, for the reasons set forth above.  See Hartmann, 2013 WL 600215, at *11
("The Supreme Court of California recognizes that [Article I, Section 4 of the California State
26  Constitution] 'coincides with the intent and purpose of the First Amendment establishment
clause.'"), citing E. Bay Asian Local Dev. Corp. v, California, 24 Cal. 4th 693 (2000).

F.3d 580, 592 (9th Cir. 2008).  In the prison context, a prisoner must demonstrate that his

treatment is invidiously dissimilar to that received by other inmates.

Here, plaintiff has not shown that similarly situated inmates were intentionally

treated differently without a rational relationship to a legitimate state purpose.  Plaintiff asserts

that other religious groups at CMF were provided either a paid or volunteer minister, while the

Rastafarians were not provided a dedicated minister.  He also asserts that inmates of other

religions had an "individual place of worship" while the Rastafarians did not.  (Dkt. 1 at 4.)

First, plaintiff has not shown that he is similarly situated to inmates belonging to

other religious groups.  A small number of inmates at CMF identified as Rastafarian during the

relevant period, and at DVI, there was apparently no Rastafarian program prior to plaintiff's

arrival.  Prison officials are not required to provide exactly the same accommodations to large and

small religious groups alike.  See Cruz, 405 U.S. 322 n.2.

Second, plaintiff has not shown that he received dissimilar treatment not rationally

related to a legitimate state purpose.  Plaintiff was allowed to participate in group religious

activities at scheduled times, like inmates of other religions.  Prison officials provided chapel

time, chaplains, and other staff to facilitate the Rastafarian religious program and allowed inmate

volunteers and outside vendors, as with other religious groups.  Rastafarians were allowed to

possess headwraps, medallions, banners, pictures, and other religious items, subject to certain

safety regulations and the 2010 delay described above.  Although plaintiff did not receive renewed

artifact chronos in 2010, he has not shown that inmates of other faiths were treated differently, or

that the no-renewal policy did not apply across the board to inmates of all religions.  Nor has

plaintiff shown intentional discrimination.

The Hartmann plaintiffs alleged that prison officials violated their Fourteenth

Amendment right to equal protection by denying them a paid, full-time Wiccan chaplain.  Id. at

*6.  The Ninth Circuit agreed with the district court that plaintiffs failed to state a claim on this

basis, as attachments to the pleadings did not plausibly show that defendants "discriminatorily

1  denied their requests for a paid full-time Wiccan chaplain." Id.  Rather, exhibits attached to the

2  complaint showed that prison officials considered plaintiffs' requests at three levels of review and

3  ultimately determined that a paid Wiccan chaplain was not necessary because both a volunteer

4  Wiccan chaplain and staff chaplains were available to assist with Wiccan services.  Id.

5        Similarly here, the record does not suggest that defendants intentionally

6  discriminated against plaintiff by failing to provide a paid Rastafarian chaplain, but rather shows

7  "a reasoned and vetted denial of [plaintiff's] requests." See id. at *6.  Thus the instant

8  recommendation that summary judgment be granted on plaintiff's equal protection claim is not

9  inconsistent with Hartmann.

10  C.  Due Process

11        Plaintiff alleges that defendants' interference with his religious exercise denied him

12  due process under the Fourteenth Amendment.  If a claim implicates a specific constitutional

13  right, the claim should be analyzed under that standard and not under the Due Process Clause.

14  Armendariz v. Penman, 75 F.3d 1311, 1318 (9th Cir. 1996), overruled in part on other grounds as

15  stated in Crown Point Dev., Inc. v. City of Sun Valley, 506 F.3d 851, 852-853 (8th Cir. 2007).

16  "The scope of substantive due process does not extend to areas addressed by other, more specific

17  provisions of the Constitution." Id. at 1326.  Here, plaintiff's religious exercise claim must be

18  analyzed under the First Amendment and his religious discrimination claims under the Equal

19  Protection Clause of the Fourteenth Amendment, as discussed above.

20        In sum, for the foregoing reasons, the undersigned concludes that defendants'

21  motion for summary judgment be granted.

22        Accordingly, IT IS HEREBY RECOMMENDED THAT:

23        1.  Defendants' March 9, 2012 motion for summary judgment (Dkt. No 21) be

24  granted; and

25        2.  This case be closed.

26  \\\\\

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within seven

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

6    failure to file objections within the specified time may waive the right to appeal the District

7    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8     Dated: March 15, 2013

9

10   CAROLYN K. DELANEY
     UNITED STATES MAGISTRATE JUDGE

11

12

13   2
     blan0171.msj

14

15

16

17

18

19

20

21

22

23

24

25

26